United States Court of Appeal for the Fifth Circuit. We have five cases to be orally argued this morning, so please observe the light and bring the argument to a close when the green light goes off and the yellow light, the red light comes on. And with that I will call the first case for today, the United States of America v. Gary L. Cain. Mr. Stephanie L. Stephens will be first. You may proceed. Good morning, Your Honors, and may it please the Court. My name is Stephanie L. Stephens. I represent the appellant, Gary Cain, and I would like to focus my time this morning on Issue No. 5, the erroneous instruction to the jury regarding deliberate ignorance, if it pleases the Court. The entire defense for Mr. Cain was a lack of knowledge of any criminal activity. Mr. Gary Cain came to the court to give the deliberate indifference to fracking companies, oil companies, and child labor. How can it be error to give the deliberate indifference instruction or not when the government's theory is actual knowledge? Yes, Your Honor, the government's theory was actual knowledge, and, in fact, this Court has authored cases such as Ariza-Jacobo, which have said that when a case is actual knowledge versus no knowledge, when it's that simple choice between the two, it's error to give the instruction, and further, it's error to give that instruction if there's no evidence of any contrivance to avoid knowledge of any, as this Court noted in Laura Velazquez's colloquial way of stating . . . Didn't we also say in Ariza-Jacobo, the same case you mentioned, didn't we say in that same case that the error is harmless when there's substantial evidence of actual knowledge? Absolutely. In that case, this Court did, and I think that that's why it's relevant that the entire defense here was a case of no knowledge on the part of the defendant, and many of the facts that were listed as actual knowledge by the government were facts in controversy, and the jury wasn't able to give them the full weight and value because the burden of mens rea was lessened by this instruction. I think it's important to compare the harm analysis in the cases such as Ariza-Jacobo, where this Court has found it was error to give such an instruction, but harmless, with the facts of the case before the Court today, Mr. Keynes. In each one of those, including Ariza-Jacobo, the defendant or appellant was an active participant. In Ariza-Jacobo, the defendant was . . . I believe that was a marijuana transportation case, or was that the methamphetamine, I'm sorry, methamphetamine in the candy case, and the defendant was the one who actually carried the bags of candy across the border. He changed his story numerous times when confronted by the border agents. He made efforts to distract them. So there was substantial evidence that he actually knew that he was distributing methamphetamine, not ignorance on his part. Whereas Mr. Keynes was never an employee. He was never an investor. He was a consultant. He had no signatory power on the bank accounts or on any of the books. He didn't control the books. His access to the financial records . . . I thought he was brought in to clean up the mess. He was brought in. And then he didn't, according to the government's theory, he failed to clean it up and then joined it. He was paid, and his pay never changed, so he wasn't on any sort of profit basis where if he continued some sort of fraudulent scheme, his pay would go up. He was hired as a consultant at a set pay and was paid that and no more, and he was hired to come in and help a struggling quite a bit of evidence that he indeed did give such help to the company. He factored their invoices, which provided cash to pay the investors. He really tried numerous times to clean up what he saw as mismanagement of the company. The government cast that as a proof that Mr. Keynes knew or that he should have known, which again is the danger of that instruction that was given to this jury. They were allowed to argue that Mr. Keynes should have known a crime was afoot because the bookkeeping was bad, because there were inappropriately clad women in the office, because there were posters on the wall that were inappropriate, the indecorious behavior in the workplace, and that Mr. Keynes should have known. That's exactly why this court has time and again said that instruction should rarely be given because the danger is that it will lessen the burden of proof to a negligence type mens rea and allow a jury to apply a reasonable person standard rather than did he have actual knowledge. And specifically, I think that's exhibited in this case when the defense objected to the instruction on deliberate ignorance. The trial court statements demonstrated the danger quite well, showing that the trial judge stated he believed it really should have been given because men like Mr. Keynes and Mr. Uresti should have known what was going on when they had clad women and behavior such as what was happening at the offices of Four Winds. Likewise, it's not hard to imagine that that's exactly what the jury would have thought, and he would have been able to convict someone who was naive, foolish, stupid, or negligent, as this court has said, time and again when remonstrating that we should not be giving this instruction except on very rare occasions. Specifically in Arezzo v. Giacobbo, this court focused in on the second prong of the test, the first prong being whether there was a substantial awareness, subjective awareness of a high probability of the existence of illegal conduct, and the second prong being that was there purposeful contrivance to avoid learning of the illegal conduct. And this first prong is frequently an inquiry into the actual knowledge of the defendant or appellant. The second prong tends to determine the correctness of providing that instruction. And I think that when we focus on the evidence in this case, the evidence shows no behavior of, don't tell me, I don't want to know, but rather, please tell me, I do want to know. The evidence shows from several witnesses that Mr. Cain repeatedly asked for financial records from the company, that he insisted on hiring an outside CPA to look at those records. Mr. Cain is not a lawyer. He is not a certified public accountant. He thought the records did not look as though they were kept properly. What did the government argue to the jury with regard to actual notice? The government argued to the jury of actual knowledge, Judge Higginbotham, that three witnesses had told Gary Cain about Mr. Bates' profligate spending, Mr. Bates being the head owner of the company, and one of those was a woman named Desiree Talley. She was a personal assistant to Mr. Bates, and she said she thought he was independently wealthy. She knew he spent ridiculously, he spent large sums of money. She thought this was his money. She didn't see anything criminal, and she worked closest with him. Mr. Bates, supposedly Shannon Smith, a partner in the company, also charged in the case, co-defendant, he claimed he had told Gary about the spending. What did the government, I thought the government argued to the jury that Cain knew. The government argued Cain knew based on these three people having told Mr. Cain. But the theory was actual knowledge, and we've said repeatedly, most recently in the Ottey case itself, and I quote the quote that keeps handing down, even though we are for the district court to give deliberate and different instruction when the government's theory was actual knowledge, we've held that given the instruction, it's harmless where there is substantial evidence of actual knowledge. So how do you deal with that? Yes, and the government did argue several times, and in their brief before this court, they, on page 49 and on page 52, they said, in closing argument, we said the government argued Cain had actual knowledge. The thrust of the argument was he had actual knowledge. Their evidence of actual knowledge was a statement Mr. Cain made to investigators 16 months after the event, a statement in hindsight saying, I suppose when I was factoring these invoices, when I was bringing more money into the company, I was allowing Mr. Bates to keep doing what he was doing. Well, what about the memo that Mr. Cain wrote in December? Let me get the year wrong, but is it 2014? He wrote it, I believe, on January 9, 2015, Your Honor, and that memo was titled, Thoughts going forward, changes in the mismanagement of the office. And the government does argue that demonstrates actual knowledge. We argue it does not, and therefore the jury should have been allowed to look at that and consider it, controverting facts as they came out, but because of his instruction, they were allowed to consider maybe he should have known. I'm sorry, you said the jury should have been allowed to look at this memo? The jury should have been allowed, they were allowed to look at the memo, they were told. Right, it was part of it, part of the record. Just to be clear, the memo was shown to the jury? Yes, Your Honor. Okay. And the defense argued that that memo merely demonstrated Mr. Cain was aware of poor business practices, nothing criminal, poor business practice, and therefore it was actual knowledge versus no knowledge. That was the classic binary choice the jury should have been given. The instruction, however, altered that. By bringing in this instruction, the government was allowed to argue, see, he should have known with all these bad office practices going on, a reasonable person would have known crimes were being committed. What of his statement that after reviewing the records, quote, I instantly know that the P&L sheet is all messed up and not even close to reality? Correct, and Mr. Cain did say that, and he testified that what he meant by that was it was poor bookkeeping, it was not done properly in his opinion. He did say it's not a CPA. Poor bookkeeping is one thing, not even close to reality sounds very different. True. He noted that they were marked, they were noting purchase orders as actual sales, and he told them they should not in any way mark those as actual sales. Why is that not knowledge of fraud? It may not be his fraud, but it's knowledge of fraud. He believed that they were, that the sheets contained the full story there, but it was listed in the wrong place, so to speak, that on the business sheet, and they marked it in the wrong column, but they did note it was purchase orders, not actual sales, so that he could look at these sheets and he could tell exactly what was going on in the company. Of course, our question is whether the jury could have concluded it was actual knowledge. You have to make a good argument, but the jury plainly doesn't accept that. Save some time for the restitution argument. I think that, to me, is a more difficult issue. Yes, and if there are no further questions on that issue, then I will address the restitution issue, which in this case, all four investors came to this company before Gary Cain came on. He had nothing to do with any false statements that were made to them, anything that was done in that vein to lure them in, perhaps, was not even aware of how that money had been spent initially. It wasn't until sometime much later that Gary Cain became aware of investors' funds being used for one person to pay another, and that was much later, after he had left the company. All of these activities that occurred, he was held jointly and severally liable for. When he came on board to clear up the mismanagement, he couldn't possibly have reasonably foreseen that $6 million as the government, $6 million plus. Let me put this question to you. Let's assume for the moment that that was error. They've not objected to. So you're here on plain error. Correct. If we move to the third prong of plain error analysis, then I think I have some trouble with the clarity and the plainness, if you will, in the first prong, actually. You rely heavily on United States v. Morrow, but Morrow just had nothing to do with restitution. It's dealing with relevant conduct for determining the appropriate level offense, which is true that it doesn't include conduct of others before a defendant joined a criminal venture because it's not reasonably foreseeable. But relevant conduct under the guidelines simply does not define the scope of a restitution order. My concern is, under the plain error doctrine, whether we can find that plain under the state of the law. Yes, Your Honor. And, of course, the Court is correct that there was not an objection. It is plain error. But I'm just trying to frame the argument. So I think that's where the issue lies. And, Your Honor, that Morrow case was used analogously to demonstrate that one party could not be held. I understood your use of it, but the question is, is clarity, sufficient clarity under plain error? And the facts that we have relied on to try and demonstrate the plain error in this case are that Bates, Smith, and Uresti were clearly the key actors. Even the Court noted that repeatedly during the sentencing hearing. Mr. Cain had no decision-making authority. He had no control over what those three did prior to his coming. He had no way to foresee any of the actions that would have occurred. When he joined Four Winds, he had no way of knowing any of the behavior that had occurred prior to him, certainly behavior that, if this Court wishes to hold him responsible for behavior that occurred after the fact, that might make more sense. But the government has assessed the full amount, and most of that amount is derived from investors and their spending and their losses prior to Gary Cain's. Well, enough. But in the conspiracy cases, the restitution for a scheme to defraud is that the government charges Cain and others with conspiracies beginning in 2014, and it states that Cain did not become involved until later that year. Can you identify a case that says that the general conspiracy theory, you're liable for the full conspiracy you join, doesn't also support a full restitution that was ordered? I do not have a case directly on point for that, Your Honor. Yeah. And I do see that I'm out of time. I will trust it again in my rebuttal. Thank you. You have some time on rebuttal. Mr. Durbin? Good morning, and please, the Court. If I might, I'll begin with the restitution, Judge Keegan-Maughton. That appears to concern the panel more than I'll get to deliberate ignorance. I think you've hit the point. It's a clear error, or it's a plain error standard that applies. I think the answer to that is the nature of the scheme. Mr. Cain joined the conspiracy under our theory, probably actually joined it sometime between December and January, December of 2014 and January. And our theory was, and the theory in part was also what supported the money laundering offenses, is that it was an ongoing repetitive type fraud. In other words, it wasn't a fraud with a single transaction where the investors put up money, and now they've been divested of their money. The way the scheme worked is they would have their money invested in sand, and they were supposed to have that invested in them, and they would make decisions all over again about whether to invest in another sand transaction. So it wasn't like they were buying equity. That's not what was going on. It was serial transactions as it was designed. And what Mr. Cain's responsibility was is when he found out, when he figured out what was really going on, and I think there's some argument, he knew in the first meeting with Mr. Bates that something was really going on, because he told himself, this sounds like a snake oil salesman to me. But by the time he was actively involved, he made representations to the Thumbs, to Richard and Charlene Thumb. They were concerned about the security of their investment, and he said to them on two occasions, in December and I believe again in February, not to worry if there's something that's out of place, I'll let you know. And he didn't. And he knew by then, he knew well that there were things that were not right with the finances. And he also seriously misled Denise Cantu. And that was in the March-April timeframe. And he told her specifically, and she was concerned about her investment, and he told her specifically all your money was used to buy sand. And he knew that was not true. He had been told by Laura Jacobs that that was not true. He knew in the books by that time that it was not true. He had done an accounting of his own and knew that none of her money was in sand. Yet he badgered her, he basically bullied her with a text that's in the record that said, well, if you want your sand, I'll deliver it to your front door, but you have to pay for it COD. And she was probably the most fragile of the victims. But the nature of the scheme I think addresses the issue of whether or not it's reasonable that the restitution amount encompassed the entire amount of the scheme. Because by the time early 2015 was around, Cain's interest was in keeping those investors in, making misrepresentations so that he wouldn't pull their money out because he apparently had some belief that he could get this valve company going that was going to produce enough funds to keep the other, the sand side going until the market came back. Plus he was making $15,000 every two weeks and he'd come to the four wins job or the opportunity after having been out of jail for a while with some health issues. So I think that makes it not a plain error under the circumstances. With respect to the deliberate ignorance instruction, there were two, I think there were two defenses here that Mr. Cain was trying to put across and he testified. And one of the defenses was, well, I didn't really know. It was a sort of I didn't have actual knowledge, which implicates the deliberate ignorance instruction. And I believe that there is evidence in the record of a contrivance, not to know. And that is the information that or the evidence that when he was involved in the fall of 2014, he participated in or went to some investor meetings, pitches put on by Mr. Bates. And Mr. Bates would say things such as, sand is better than gold or silver. It's the best commodity in the world. And Cain already had heard it, already had thought to himself, this is a snake oil salesman. And he would get up and leave. And on other occasions, Bates would say, we have $18 million in the bank, don't we? And Cain knew that was not true. And his response was, he didn't want to sit and listen to, I think, he didn't want the inferences, he didn't want to sit and listen to the full nature of the fraud because he knew that Bates was making misrepresentations. In the end, I think, the real defense was for Mr. Cain was, it went to whether or not he had the specific intent to defraud those victims. And that carries a higher mental state. There was instruction, there were two instructions on the intent to defraud, as well as an instruction on good faith. And that basically was what Cain's defense was. And the circumstances were more than sufficient to show they had knowledge of the fraud, as well as sufficient to show that he had the intent to commit the fraud, to defraud those victims, to keep the scheme going. And the closing argument put to the jury squarely the question of, you can believe Cain and Denise Cantu and the Thumbs who testified about the misrepresentations that he made to them. And, I mean, he made some noise about, he didn't really get all of the records from Laura Jacobs until, oh, he didn't start getting them maybe until November. But he was able to write that memorandum that you referred to, Judge Ho. And that memorandum, it was dated January 9th, but I think there was some testimony where he had told agents that he had actually prepared it in the last week of December. And if you go through that memorandum, many of those items match specifically to the fraudulent circumstances. I mean, they, that's what he's talking about, where we have to have hiring plans for people who have skills in the industry. And because what he was hiring was what Laura Jacobs referred to as the Barbies, was based on their looks. That we have to have compensation plans in place because he was paying for his son's college expenses, for rental cars, he had prostitutes flown in, he was paying for meals and all kinds of stuff, which, by the way, started at the very beginning. He started spending that money, contrary to the joint venture agreements and Dr. Zare's money, the day he got it. And so the circumstances were substantial. There was substantial evidence, both of his actual knowledge and there was substantial evidence of his intent to fraud. If there's no further questions, I would like my time to go to busy morning. Thank you. Thank you. You have five minutes on rebuttal. Thank you, Your Honor. Please support. What do we do? You have a very, very experienced United States District Court judge, Judge Sessions, and no one objects. And he's looking at this evidence, too. How do we find plain error out of that? Your Honor, I believe the plain error comes from, just as the prosecutor has stated, that Mr. Cain, they believe, became aware of the issue in December 2014 or January 2015. He claimed that it was an ongoing scheme. But in February of 2015, the investors were already asking for their money back. So there was no further payments, no further fraud, no further information. And the only thing he points to is that Mr. Cain told Denise Cantu that she had money and that her money had been spent on sand. Mr. Cain argued that he believed that that was true. And likewise, there was information that Mr. Cain had represented to another investor that things were fine. Those occurred in December and in January. Around the time, January 9th, is when he wrote that memo recognizing the bad problems, the mismanagement in the office, not criminal. How does the amount of restitution here relate to the time span of the scheme? To the time span? Because— How do you look at that in a causal sense? Because I believe that the court, the restitution is based on the reasonable foreseeability of the actors, whether in terms of their— Well, I understand that. But the question is, he's ordered a restitution of X dollars. And if we accept the theory that it was only after he joined it, what's the basis for determining whether or not that same amount of money would have been warranted for that limited period as well? In other words, the predicate of your argument is that the restitution order extends beyond the period of time in which he, quote, joined the conspiracy. That's kind of the jumping point of the argument. I'm going back to the very core of it, of the causal relationships here, which adhere in these restitution orders. But our argument is that that amount of money, based on their evidence, was shown to have already been lost or fraudulently taken prior to Gary's coming on board? What was the total loss here to investors? Six million? No, all the investors. The total loss here was how much? The government claimed the total loss to all the investors was $6,200,000-something. I apologize. I looked at the exact amount here. But that was what the government said was the total loss for all of the investors, which they listed as victims. And it is our contention that occurred before. I would also like to address briefly, in response to the evidence of contrivance, the prosecutor noted, Mr. Durbin noted, that he believed or he thought, it was his impression, that Mr. Cain's leaving the room during pitch meetings conducted by stand-bates was a sign that he knew misrepresentations were occurring. And that's exactly the danger of an instruction that allows for a reasonable person, or a person who should have standard rather than actual knowledge. That Mr. Cain left the room when Mr. Bates was making pitches, there's not evidence to show that it was because he knew fraud was being committed. In fact, Mr. Cain stated the opposite. Mr. Bates did engage in puffery and noting that sand is better than gold or oil. I don't think that that is something that we could state as a fraudulent statement. And in fact, at the beginning of this company, when fracking had taken off, sand was quite valuable at that time. He pointed out that you can believe Mr. Cain or you can believe the government witnesses. And that exactly was the government's argument here. You can believe one person or you can believe the other. And this Court has said repeatedly that when it is down to that simple choice, the deliberate ignorance instruction is dangerous because it reduces the mens rea to negligence. It doesn't allow the jury to fully weigh out those two, no knowledge versus actual knowledge, and reach its own conclusion. Instead, it injects in a should-have standard that is quite harmful. Consultants are regularly used to come in and clean up businesses and to help them prove that it's not evidence of fraud. We would urge this Court that harm exists and request reversal and remand for a new trial. Thank you. Thank you.